|  |  |
|---|---|
| Praxis Precision Medicines, Inc., | ) |
| | ) |
| Plaintiff, | ) Civil Action No.  25-1256 (UNA) |
| | ) |
| v. | ) |
| | ) **REDACTED** |
| David B. Goldstein and | ) **PUBLIC VERSION** |
| Actio Biosciences, Inc., | ) |
| | ) **Jury Trial Demanded** |
| Defendants. | ) |

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

Plaintiff Praxis Precision Medicines, Inc. ("Praxis"), by and through its attorneys, upon

knowledge as to itself and its own acts, and upon information and belief as to all other matters,

hereby brings this Complaint against Defendants David B. Goldstein and Actio Biosciences, Inc.

("Actio"), pleading as follows:

## INTRODUCTION

1.      This case is about breach of contract and the misappropriation of valuable trade

secrets and confidential business information.

2.      Plaintiff Praxis is an innovative biopharmaceutical company that is developing

therapies for debilitating central nervous system disorders, such as epilepsy.  Founded in 2015,

Praxis has spent over a decade and hundreds of millions of dollars developing cutting-edge

medicines, including pioneering work on potential therapeutics for KCNT1-related epilepsies.

3.      Defendant Goldstein was a co-founder of Praxis and for many years served as

Praxis' Global Lead Scientific Founder and Chairman of its Scientific Advisory Board.  Praxis

and Goldstein entered into advisor agreements under which Goldstein advised Praxis in support

of its research, product development, corporate and marketing activities. These agreements set restrictions on Goldstein's use of Praxis' confidential information and trade secrets.

4.     From Praxis' founding in 2015 until he left the company in 2022, Goldstein had essentially unfettered access to Praxis' confidential information and trade secrets. Praxis shared this information with Goldstein with the understanding that he would abide by his contractual commitments to hold all of Praxis' confidential information and trade secrets in confidence, not to disclose that information to any third party, and not to use that information for any purpose except as necessary in the course of advising Praxis.

5.     As it turns out, Goldstein's professed commitment to confidentiality was a calculated deception. In reality, while still acting as Praxis' scientific advisor and with ongoing access to Praxis' confidential information and trade secrets, Goldstein planned and launched a competing company in the KCNT1 development space. That is Defendant Actio.

6.     Goldstein, in breach of his contractual obligations, used Praxis' confidential information and trade secrets to advance Actio's development program and disclosed Praxis' confidential information and trade secrets to others at Actio to unfairly expedite Actio's development of competing KCNT1 inhibitors. Goldstein and Actio also disclosed and misused Praxis' trade secrets by filing patent applications that wrongfully claim ownership of KCNT1 inhibitors that were derived from compounds that Praxis discovered.

7.     Praxis therefore brings this complaint against Goldstein and Actio to vindicate its rights and put a stop to any further misuse of Praxis' confidential information and trade secrets.

**PARTIES**

8.     Plaintiff Praxis is a Delaware corporation having its principal place of business at 99 High Street, 30th Floor, Boston, Massachusetts 02110. Praxis is a clinical-stage biopharmaceutical company translating insights from research about the genetics of epilepsies

into therapies for central nervous system disorders that are characterized by neuronal excitation-inhibition imbalance, including disorders for which there are no current effective therapies.

9. Defendant Goldstein is an individual residing in San Diego, California. Goldstein is a founder and the Chief Executive Officer of Defendant Actio.

10. Defendant Actio Biosciences, Inc. is a Delaware corporation having its principal place of business at 11202 El Camino Real, Suite 100, San Diego, California 92130. Actio describes itself as a company that develops drugs for rare diseases, including epilepsies.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over this controversy under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). It has supplemental jurisdiction over Praxis' state-law claims under 28 U.S.C. § 1367.

12. This Court has personal jurisdiction over Goldstein under a Master Advisory Agreement ("MAA") between Praxis and Goldstein, executed as of March 3, 2021. In the MAA, Goldstein consents to the exclusive jurisdiction of courts of the state of Delaware in connection with any disputes related to or arising out of that agreement.

13. This Court has personal jurisdiction over Defendant Actio because it is incorporated in Delaware.

14. Venue is proper in this District under 28 U.S.C. § 1391. Defendant Goldstein consented to venue in this District under the MAA. Defendant Actio is incorporated in Delaware and thus resides in this District for venue purposes under 28 U.S.C. § 1391(c)(2).

## STATEMENT OF FACTS

### A. Founding of Praxis and Its Mission

15. Prior to the founding of Praxis, scientists Steven Petrou (then Deputy Director of the Florey Institute for Neuroscience and Mental Health and Head of the Division of Epilepsy at

3

the University of Melbourne, and now Chief Scientific Officer of Praxis) and Goldstein had been collaborating on research relating to the genetics of epilepsy.

16.     In 2014, Goldstein visited Petrou at the Florey Institute in Australia while Petrou's lab was performing research that demonstrated that certain genetic mutations implicated in epilepsy cause a marked increase in the activity of the sodium-activated potassium channel of the central nervous system.  In April 2014, Petrou and his colleagues published the results of that research and included Goldstein as an author.

17.     Petrou's and Goldstein's research attracted the attention of biotech investors, who provided funding to start EpiPM Therapeutics, Inc., which was incorporated in Delaware on September 22, 2015.  EpiPM was formed for the purpose of developing the research of Petrou and Goldstein into clinical products to treat patients with epilepsy.  Goldstein, one of the co-founders of EpiPM, became a shareholder of and a scientific advisor to EpiPM.

18.     On October 25, 2016, EpiPM Therapeutics changed its name to Praxis Precision Medicines, Inc.  Goldstein continued in his role as scientific advisor.

**B.     Praxis' Research and Development of Epilepsy Treatments**

19.     Petrou's and Goldstein's research focused on the role of a specific gene, referred to as KCNT1, in causing epilepsies.  "KCNT1" is short for "Potassium Channel Subfamily T, member 1", where "K" is the chemical symbol for potassium.

20.     The central nervous system ("CNS"), which includes the brain, spinal cord and nerves, transmits information through electrical signals propagated from neurons to other neurons, muscles or glands.  Those electrical signals are generated by flow of electrically charged ions through paths on cellular membranes called "channels" and cause the body to perform functions such as moving muscles or releasing hormones.  One such "channel" is the

sodium-activated potassium channel, which is highly expressed throughout the CNS. The KCNT1 gene provides genetic instructions for making the sodium-activated potassium channel.

21.     Scientists discovered that mutations in the KCNT1 gene can lead to severe neurological disorders and intractable childhood epilepsies. Specifically, gain-of-function mutations in KCNT1—that is, mutations that *increase* the biological activity of the sodium-activated potassium channel—cause drug-resistant and severe forms of infantile epilepsy. These epilepsies lead to significant cognitive disabilities in affected infants. In many instances, those disabilities continue or increase as the child grows to adulthood.

22.     The seizures and comorbidities caused by KCNT1-related epilepsies cannot be treated using conventional antiepileptic drugs. In fact, no approved therapies currently exist specifically to treat KCNT1-related epilepsies, and treatment options are extremely limited.

23.     Since its inception, Praxis has pursued development of orally active, selective inhibitors of the sodium-activated potassium channel as potential therapeutics for KCNT1-related epilepsies ("KCNT1 inhibitors"). This program, called PRAX-020, is among the most advanced research efforts into the development of KCNT1 inhibitors in the United States.

24.     In 2016, Praxis developed a method for performing high-throughput screening of selective KCNT1 inhibitor candidates using a rubidium flux assay in mammalian cells that are genetically modified to express a mutated form of the KCNT1 gene. Praxis' high-throughput screening process gives Praxis an efficient way to screen thousands of potential candidate compounds to identify functionally active (*i.e.*, therapeutic) KCNT1 inhibitors.

25.     Starting in 2017, Praxis used its high-throughput screening assay to screen approximately 72,000 compounds from a custom-built library of candidates that was innovated

to maximize chemical diversity.  Using a threshold of 55% inhibition, Praxis identified approximately 700 KCNT1 inhibitor candidates, a hit rate of about 1%.

26.    Praxis then conducted the assay on the 700 candidate compounds to identify compounds that showed inhibitor activity at relatively low concentrations, which is desirable to avoid potential toxicity issues.  That screening narrowed the group to 270 candidate compounds. Praxis then used machine-learning algorithms to "cluster" these compounds into groups based on shared properties, such as molecular structure and functional similarity.

27.    The candidates in each compound cluster were chemically synthesized (*i.e.*, physically made), and their properties characterized, including by measuring the concentrations at which the candidates inhibit the potassium channel's maximum activity by 50% ($IC_{50}$).  The candidate compounds were then evaluated using structure-activity relationship ("SAR") studies to assess structural similarities among them.  This is a time-consuming process, involving years of work, including because not all compounds that can be identified through machine-learning algorithms can be easily synthesized.  Additional time and effort was necessary to develop assays for measuring the activity of the candidates and to evaluate their SARs.

28.    Through this arduous, years-long and confidential analysis and testing, Praxis eventually identified candidate compounds that were suitable for clinical development.

### C.    Praxis Possesses Valuable Trade Secrets Relating to KCNT1 Inhibitors

29.    Praxis' work on the development of KCNT1 inhibitors began contemporaneously with its founding in 2015, which was before many of its competitors started working in this space.  Since its inception, Praxis has heavily invested in designing and selecting proprietary KCNT1 inhibitor candidates, developing assays to evaluate these candidates, and understanding the structure-activity relationships of these candidates.

30.     Through years of research and development and its extensive investment, Praxis has developed confidential information and trade secrets relating to its KCNT1 inhibitor development program.  Praxis' data and information relating to its non-public candidate KCNT1 inhibitor compounds, including the identity, formula, structure, properties and KCNT1-inhibiting activities of each such compound, constitute confidential and trade secret information.  The non-public results of assays and comparative analyses of candidate KCNT1 inhibitor compounds also constitute Praxis' confidential information and trade secrets.  And Praxis possesses non-public know-how that constitutes additional confidential information and trade secrets.

31.     Praxis' confidential information and trade secrets form the foundation of a collaboration and license agreement with Belgian biopharmaceutical company UCB Biopharma SRL ("UCB").  To this collaboration, Praxis contributed its confidential KCNT1 compound data, and established assays and related know-how to enable the development of KCNT1 inhibitors, while UCB undertook responsibility for performing ongoing medicinal chemistry as well as development and commercialization activities.  Praxis remains the owner of its KCNT1 compounds and intellectual property, with its economic interest in the KCNT1 program being realized through payment of development milestones and royalties tied to the success of the collaboration's development and commercialization of KCNT1 products.

32.     Given that there are currently no KCNT1-related epilepsy treatments on the market or any effective treatment for the serious epilepsies that would be treated by KCNT1 inhibitors, becoming the first mover in the market for KCNT1-related epilepsy treatments—that is, launching the first effective KCNT1 therapy for epilepsy—would confer a huge competitive and economic advantage on a company.  As a result, there is currently a race between various companies to launch a successful KCNT1 inhibitor epilepsy therapy.

33.     The confidential information and trade secrets that Praxis possesses as a result of its research and development efforts into KCNT1 inhibitors provide Praxis and its licensee with a competitive advantage over their competitors in the KCNT1 space.  For example, Praxis' discovery of candidate compounds enables Praxis to develop unique products and facilitates future revenue streams from commercialization or licensing, such as its agreement with UCB. Praxis has discovered many candidate KCNT1 inhibitors, some of which may turn out to be effective in treating CNS disorders and some of which may not.  Having multiple compounds that may be used as KCNT1 inhibitors provides Praxis and its licensee with flexibility to select the most promising compounds and to ensure a pipeline of back-up compounds.

34.     Those advantages would be severely reduced or even eliminated if Praxis' competitors were to become aware of its confidential and proprietary KCNT1 compounds and related information and use that information to develop similar compounds to compete with Praxis or its licensee.  Praxis' competitors would save years of research and development costs and unfairly benefit from Praxis' investments in research and development if they were to gain access to Praxis' library of KCNT1 compounds, including because they would be able to pursue development candidates in the confidential library or similar non-public compounds.

35.     Moreover, the confidential structure-activity analyses that Praxis performed on KCNT1 compounds are valuable because Praxis' competitors could apply that information to develop new KCNT1 compounds to compete with Praxis and its licensee.  This proprietary information also gives Praxis and UCB a competitive advantage because it allows them to prioritize KCNT1 candidates that they have already identified, and also to predict which other new KCNT1 candidates may be promising.

36.     Thus, Praxis' ability to become the first mover and to recoup the significant investment it has made in advancing the science and development of KCNT1 inhibitors depends on maintaining the secrecy of its KCNT1 inhibitor trade secrets and confidential information. Defendants' misappropriation not only would erode Praxis' competitive lead but also would directly harm Praxis' economic interests under the UCB agreement by jeopardizing the achievement and value of development milestones and royalties.

**D.     Praxis Protects Its Confidential Information and Trade Secrets**

37.     Praxis takes strict measures to maintain the confidentiality of its confidential information and trade secrets.

38.     When new personnel join Praxis, they go through an onboarding process.  As part of this process, they review and agree to be bound by the company's policies and standards of conduct, including its standards relating to protection of confidential information.

39.     As a condition of employment, every Praxis employee must execute a Confidentiality, Assignment, Noncompetition and Nonsolicitation Agreement ("Confidentiality Agreement").  This agreement broadly defines Praxis' confidential information to include "all information, whether or not in writing, concerning [Praxis]'s business, science, technological, financial information that [Praxis] has not released to the general public", as well as "operational and technological or scientific information, including . . . testing data and strategies, research and development strategies, designs, methods, procedures, formulae, data, reports, discoveries, inventions, improvements, concepts, ideas, and other Developments [], know-how and trade secrets".  It also provides that employees must "not, at any time, without [Praxis]'s prior written permission, either during or after [their] employment, disclose any Proprietary Information to

anyone outside of [Praxis], or use or permit to be used any Proprietary Information for any purpose other than the performance of [their] duties as an employee of [Praxis]".

40.     All Praxis personnel are subject to Praxis' Code of Business Conduct and Ethics (the "Code of Conduct").  Under the Code of Conduct, all Praxis directors, officers and employees "must maintain the confidentiality of confidential information entrusted to them by [Praxis] or other companies" and are "expected to review and sign an acknowledgment regarding the Code on a periodic basis".  They are also required to enter into a non-disclosure agreement or a confidential disclosure agreement before initiating discussions with third parties, or, at a minimum, before sharing any Praxis confidential information with such entities.

41.     Praxis' Confidential Disclosure Agreement ("CDA") for use with third parties has a broad definition of confidential information, including among other things "all scientific, business, financial, technical or other information or materials owned, possessed or used by Disclosing Party, regardless of form, that is disclosed by Disclosing Party to Receiving Party, whether or not labeled or otherwise identified as 'confidential'".  The CDA requires that third parties "will hold in strict confidence and will not disclose, publish, divulge, furnish, or make accessible to any third-party any of [Praxis'] Confidential Information" and "may use the Confidential Information only in connection with the [purpose of the engagement,] and shall not use the Confidential Information for any other reason, including but not limited to, use for the benefit of Receiving Party or for the benefit of any other third-party".  The third party must "use the same degree of care to prevent any unauthorized access, disclosure or use of the Confidential Information as Receiving Party uses to protect its own Confidential Information of like nature, but in no event less than a reasonable degree of care".

42.     Praxis instructs employees to maintain confidentiality even when sharing information internally.  During the time that Goldstein worked with Praxis, in addition to email, Praxis used Box as a secure file-sharing service for sharing confidential materials internally.  Only individuals who were authorized had access to the relevant Box folders that contain Praxis' confidential information.  This access was moderated by Praxis' internal IT personnel.

43.     Praxis uses a stringent publication review and approval process, requiring any external disclosures and publications to be reviewed and approved by its CEO.

**E.     Goldstein Had Access to Praxis Trade Secrets and Confidential Information**

44.     Goldstein served as Lead Scientific Founder and Chairman of the Scientific Advisory Board of Praxis from its founding (as EpiPM Therapeutics) until he resigned in 2022.

45.     On the day he became Lead Scientific Founder, Goldstein executed a Founder and Scientific Advisory Board Agreement (the "FSABA") with Praxis.  Under the FSABA, Goldstein agreed to provide Praxis with guidance on "corporate, research and product development and marketing activities as [Praxis] may request".

46.     Goldstein had a deep understanding of the genetic aspects of KCNT1 and other disease pathways that were being pursued by Praxis.  Based on this expertise, Goldstein continuously advised Praxis on its various epilepsy drug candidates.

47.     The Scientific Advisory Board comprised a small group of individuals who advised Praxis on its ongoing research and development programs, including the PRAX-020 program.  As Lead Scientific Founder and Chairman of the Scientific Advisory Board of Praxis, Goldstein was privy to Praxis' cutting-edge scientific development of KCNT1 inhibitors.

48.     The Scientific Advisory Board met regularly during Goldstein's tenure.  Board members worked closely with the scientists at Praxis to review the progress of the development

team.  For example, the Scientific Advisory Board was privy to discussions about which compounds were being pursued or prioritized by Praxis' scientists and provided their advice on those plans.  The Scientific Advisory Board also collaborated with Praxis' scientists on how to test KCNT1 compounds to obtain the most useful data.  And the Scientific Board reviewed and provided feedback on the results of Praxis' testing of candidate compounds.

49.     In preparation for these Scientific Advisory Board meetings, Praxis scientists provided presentations for review, which would either be used as "pre-read" materials or would be reviewed live during the meetings.  Those presentations contained highly confidential information about Praxis' KCNT1 development program and candidates under consideration.

50.     By virtue of his leadership and advisory role, Goldstein had essentially unfettered access to Praxis' confidential and proprietary data, trade secrets, business plans and other Praxis information of a confidential or proprietary nature.  He also had access to all Scientific Advisory Board presentations, as well as all information stored in the Box account that Praxis used to share documents internally.  In addition, Goldstein maintained close contact with the Praxis scientific team during his tenure, and he would meet with them outside of the Scientific Advisory Board meetings from time to time, thereby gaining further insight into Praxis' KCNT1 program.

**F.     Goldstein Was Prohibited from Using Praxis' Confidential Information or Its Trade Secrets**

51.     Goldstein was bound by strict confidentiality agreements throughout the time he worked with Praxis.  Those agreements required him to protect the confidentiality of Praxis' confidential information and trade secrets, not to disclose them, and not to use them for any purpose other than Praxis' business activities.

52.     The FSABA, which Goldstein signed at Praxis' founding, required that he "hold all of [Praxis'] Confidential Information in confidence" and "not disclose any Confidential

Information to any third party". And he agreed "not to use [Praxis'] Confidential Information for any purpose except as may be necessary in the ordinary course of serving as a member of the Company's Scientific Advisory Board without the prior written consent of [Praxis]".

53.     The FSABA broadly defines "Confidential Information" to mean "all confidential and proprietary data, trade secrets, business plans, and other information of a confidential or proprietary nature, belonging to [Praxis] or its affiliates, subsidiaries or third parties with whom [Praxis] may have business dealings, disclosed or otherwise made available to [Goldstein] by [Praxis]". It also specifies that "Confidential Information includes, but is not limited to, any materials created by you that contain or are based on such Confidential Information".

54.     Goldstein's confidentiality obligations under the FSABA apply "[d]uring the term of [his] membership on the Company's Scientific Advisory Board and for five (5) years immediately afterward", *i.e.*, until 2027. But for trade secrets, the FSABA imposed stricter obligations: "the non-disclosure obligations imposed by this letter agreement with respect to trade secrets included in the Confidential Information will continue for as long as the Company continues to treat such Confidential Information as a trade secret".

55.     On March 3, 2021, Goldstein and Praxis entered into a Master Advisory Agreement (the "MAA"), under which Goldstein would continue to provide consulting and advisory services to Praxis. The MAA provides that "[t]his Agreement contains the entire agreement of the parties with regard to its subject matter, and supersedes all prior or contemporaneous written or oral representations, agreements and understandings between the parties relating to that subject matter". The MAA thus supersedes the FSABA and supplies confidentiality and other restrictions that apply to Goldstein beginning on its effective date.

56.     The MAA restricts Goldstein's use of Praxis' confidential information and trade secrets.  Goldstein agreed to "(i) hold in confidence all Confidential Information, and not disclose Confidential Information without the prior written consent of Praxis; (ii) use Confidential Information solely in connection with the Services; (iii) treat Confidential Information with no less than a reasonable degree of care; (iv) reproduce Confidential Information solely to the extent necessary to provide the Services, with all such reproductions being considered Confidential Information; and (v) notify Praxis of any unauthorized disclosure of Confidential Information promptly upon becoming aware of such disclosure".  Goldstein also agreed to "use Praxis Materials only as necessary to perform the Services", "not transfer or make available to any third party the Praxis Materials without the express prior written consent of Praxis", and "return to Praxis any and all Praxis Materials upon request".

57.     The MAA broadly defines "Confidential Information" to mean "(a) any scientific, technical, business or financial information or trade secrets in whatever form (written, oral or visual) that is furnished or made available to [Goldstein] by or on behalf of Praxis, (b) all information contained in or comprised of Praxis Materials []; and (c) all Work Product".  "Praxis Materials" is defined to include "[a]ll documents, data, records, materials, compounds, apparatus, equipment and other physical property furnished or made available by or on behalf of Praxis to [Goldstein] in connection with this Agreement".  The MAA provides that Praxis Materials "are and will remain the sole property of Praxis".

58.     Goldstein's confidentiality obligations under the MAA run for the term of the MAA "and for a period of five (5) years thereafter", *i.e.*, until 2027.  As with the FSABA, the MAA extends that period for trade secrets:  "the non-disclosure and non-use obligations imposed

by [the MAA] with respect to trade secrets included in the Confidential Information will continue for as long as Praxis continues to treat such Confidential Information as a trade secret".

59.     The MAA also requires Goldstein "to assign to Praxis all rights in the United States and throughout the world to Work Product". "Work Product" is defined to mean "all inventions, discoveries, improvements, ideas, concepts, designs, processes, formulations, products, computer programs, works of authorship, databases, mask works, trade secrets, know-how, information, data, documentation, reports, research, creations and other products arising from or made in the performance of (solely or jointly with others) the Services (whether or not patentable or subject to copyright or trade secret protection)".

60.     Goldstein agreed to "execute all documents, and take any and all actions needed, all without further consideration, in order to confirm Praxis's rights".

### G.     Goldstein's Departure from Praxis and Founding of Actio

61.     In April 2022, Goldstein abruptly notified Praxis that he would no longer serve as a Scientific Advisor to Praxis. Goldstein's MAA with Praxis was terminated on May 8, 2022, although Goldstein continues to be obligated under the MAA to maintain the confidentiality and secrecy of Praxis' confidential information and trade secrets, and to not misuse them.

62.     During the time that he had access to Praxis' confidential information and trade secrets, Goldstein was planning to launch, and in fact had launched, a competing company in the KCNT1 development space. That company is Actio.

63.     Actio was incorporated by Goldstein and John G. McHutchison in Delaware on July 20, 2021, more than half a year before Goldstein notified Praxis of his intent to terminate the MAA. Goldstein has served as the CEO of Actio since its formation.

**H.      Goldstein's and Actio's Misappropriation of Praxis' Confidential Information and Trade Secrets**

64.      Actio's now public patent applications demonstrate that Goldstein misused Praxis' confidential information and trade secrets in violation of his contractual obligations to Praxis, and that he disclosed Praxis' confidential information and trade secrets to others at Actio. Goldstein and Actio proceeded to use Praxis' confidential information and trade secrets to develop KCNT1 inhibitors that will unfairly compete with those that Praxis is developing.

65.      On June 5, 2025, two Actio patent applications, WO2025117662A1 (the "'662 Application") and WO2025117677A1 (the "'677 Application"), were published by the World Intellectual Property Organization.  To Praxis' knowledge, these publications were the first public disclosures of the structures of Actio's KCNT1 inhibitors.

66.      The '662 Application claims priority to Actio's previously non-public U.S. Provisional Applications 63/604,173 (the "'173 Application"), filed on November 29, 2023, and 63/553,526 (the "'526 Application"), filed on February 14, 2024.

67.      The '677 Application claims priority to Actio's previously non-public U.S. Provisional Application 63/604,176, filed on November 29, 2023.

68.      When it reviewed Actio's patent filings, Praxis was dismayed to learn that many of the KCNT1 inhibitors disclosed in the '173 Application closely resemble compounds that ***Praxis*** discovered but that Praxis had ***not publicly disclosed***.  The confidential structure of those Praxis compounds and their favorable properties as KCNT1 inhibitors, however, were disclosed to Goldstein during his tenure as Lead Scientific Advisor to Praxis and member of its Scientific Advisory Board.  The conclusion is inescapable that Goldstein misused Praxis' confidential information and trade secrets and shared that information and those secrets with Actio.

69.     In the table below, the lefthand column shows exemplary Praxis compounds that had never been publicly disclosed but **_were_** available to Goldstein during the time he worked with Praxis.  The righthand column shows corresponding compounds that appear in Actio's patent filings.  This side-by-side comparison reveals the striking structural similarities between the confidential Praxis compounds and the Actio copycat compounds.

| Praxis Compound | Actio Compound |
| --- | --- |
| | |

| Praxis Compound | Actio Compound |
|---|---|
| ██████████████████ | ██████████████████ |

(The '173 Application, at pp. ████.)

70.     Other compounds included in Actio's patent applications also bear close structural resemblance to compounds that Praxis discovered and published for the first time on November 2, 2023—*only a few weeks before* Actio filed the first of its patent applications.  These Praxis compounds had been disclosed to Goldstein during his tenure at Praxis but were otherwise kept confidential until publication of Praxis' patent applications.  As shown in the chart below, exemplary Actio compounds in the righthand column bear a striking structural resemblance to the corresponding Praxis compound(s) in the lefthand column.

| Praxis Compound(s) | Actio Compound |
|---|---|
|  PRX-6252 | I-42 |

| Praxis Compound(s) | Actio Compound |
|---|---|
| **PRX-4000**    **PRX-5525** | **I-42a** |
| **PRX-4030** | **I-42b** |
| **PRX-6490** | **I-44** |
| **PRX-6720**    **PRX-7115** | **I-64** |
| **PRX-6720**    **PRX-7115** | **I-67** |
| **PRX-6720** | **I-68** |
| **PRX-3995** | **I-82a** |

| Praxis Compound(s) | Actio Compound |
|---|---|
| **PRX-4001** | I-82b |

(The '173 Application, at pp. 40–49.)

71.     The similarities in these Praxis and Actio compounds were no accident.  They are the result of Goldstein's and Actio's misuse of Praxis' confidential information and trade secrets as a template for their own KCNT1 inhibitor development program.

72.     *First*, the chemical structures of the identified Praxis and Actio compounds are extremely similar and, in many instances, much of the compounds' structures is identical.  The primary difference consists merely of a single "ring closing" in the core.  That is, the primary difference between the cores is the formation of chemical bonds to transform a open chain of atoms into a closed ring, as illustrated in this diagram from the '662 Application, at page 203, Scheme C (excerpted):

**Ring *Open***        **Ring *Closed***

This modification is a commonplace variation in chemical structure, often requiring only the formation of a single chemical bond between carbon atoms to form the "ring", as illustrated:

In the context of these molecules, this simple modification is a step that would naturally occur to a medicinal chemist performing development work.

73.     An example of this modification can be seen in a comparison of Actio's compound ███ and Praxis' compound ███. These two compounds differ only in the bonds between three carbon atoms in the center, as illustrated by the red boxes below.

The same type of ring closing is seen in Actio compounds I-42, I-42a, I-42b, I-44, I-64, I-67, I-68, I-82a and I-82b, as shown above in paragraph 70.

74.     Praxis compounds and their Actio counterparts sometimes have minor other differences.  For example, some exhibit differences in the location or identity of the non-carbon atoms in the lefthand ring of the core (███████ in paragraph 69), while others have slight differences in the functional groups in the side of the molecule (████████ ███ in paragraph 69).  Again, in the context of these molecules, these changes in chemical structure would naturally occur to a medicinal chemist performing development work.

75.     The striking resemblance between the Actio compounds in its '173 Application and the never published Praxis compounds shows that Goldstein and Actio misappropriated Praxis' confidential information and trade secrets. Actio could not independently have developed so many compounds that are so similar to Praxis' confidential, unpublished compounds without relying on Praxis' confidential information and trade secrets.

76.     This is also true for the compounds that were published in Praxis' November 2023 patent applications. Actio added the compounds discussed in paragraph 7070, including I-42, I-42a, I-42b, I-44, I-64, I-67, I-68, I-82a and I-82b, to its patent applications only *twenty-seven days* after Praxis' corresponding compounds were published in its '853 Application. Using standard, even optimally efficient, scientific processes, it would have taken Actio months, or even years, to conceptualize its new compounds, acquire the starting materials, synthesize the compounds, characterize them by assay, and design further iterations of molecules through structure-activity relationship assays, let alone prepare and file a patent application. Thus, Actio was working on its copycat compounds long before Praxis published the '853 Application, and did not derive them from Praxis' '853 Application or Praxis' other public disclosures. Instead, Goldstein and Actio misused Praxis' confidential information and trade secrets to create these compounds.

77.     *Second*, it is clear from its patent applications that Actio replicated particular compounds that Praxis had synthesized and had discovered as having high activity levels (*i.e.*, those compounds that inhibited KCNT1 at potentially therapeutic levels). This activity information had been discovered by Praxis' scientists over the course of many years of analyzing thousands of candidate compounds, and was shared with Goldstein while he advised Praxis. Goldstein's and Actio's improper use of Praxis' confidential and trade secret information to

decide which compounds Actio would pursue allowed Actio to bypass the extensive and time-consuming selection, synthesis and testing of thousands of compounds that Praxis had performed to identify key KCNT1 candidates. Goldstein and Actio were thereby able to unjustly skip ahead and focus their efforts on the compounds that Praxis had already identified as promising.

78. For example, Praxis' compound ▮▮▮▮▮ demonstrates strong KCNT1-inhibitory activity, with a very low $IC_{50}$—that is, the concentration at which the compound inhibits half the maximum activity of the potassium channel. A lower $IC_{50}$ reflects higher potency, which means that the compound is more effective at lower doses than other compounds. This is a desirable characteristic in pharmacology because it means that the compound can achieve the intended therapeutic effects while minimizing the patient's exposure to potential toxicity. Given its value to its KCNT1 program, Praxis kept ▮▮▮▮▮ a secret, only sharing it in presentations to the company's Scientific Advisory Board, including Goldstein. Goldstein and Actio used the ▮▮▮▮▮ template to make "their" ▮▮▮ compound, which not only is nearly identical structurally to Praxis' ▮▮▮▮▮ but also exhibits high levels of KCNT1 inhibitor activity at similarly low concentrations. Adding insult to injury, Goldstein and Actio have sought patent protection over ▮▮▮, thereby attempting to deprive Praxis of ownership over its innovations and disclosing those innovations to other competitors of Praxis.

79. As another example, Actio's compound I-42a and Praxis' compound PRX-5525 both have strong KCNT1-inhibitory activity and differ only in the fact that I-42a closed an open ring that appears in the center of PRX-5525, as illustrated by red boxes below.

**Praxis PRX-5525**                    **Actio I-42a**

Praxis had performed multiple studies characterizing its PRX-5525 compound, which, like

████████, exhibited strong KCNT1-inhibitory activity, and shared that information with the

Scientific Advisory Board, including Goldstein. Goldstein and Actio used PRX-5525 as a

template to make "their" I-42a compound, which has a nearly identical structure and similar

effectiveness to Praxis' PRX-5525. Goldstein and Actio also sought patent protection over

I-42a.

80.     Given the significant chemical and structural similarities between Actio's

compound ████ and Praxis' compound ██████ and between Actio's compound I-42a and

Praxis' compound PRX-5525, Actio could not have independently developed ████ and I-42a.

**I.      Goldstein's and Actio's Actions Have Harmed and Will Continue to Harm
         Praxis**

81.     Through their acts of misappropriation, Goldstein and Actio have caused

significant and continuing harm to Praxis.

82.     Praxis spent significant time and money developing compounds to use as KCNT1

inhibitors. Because there are no approved therapies specifically for KCNT1-related epilepsies,

Praxis and its licensee are well positioned to be first movers in the market. But their ability to

become the first mover depends on maintaining the secrecy of Praxis' confidential information

and trade secrets. By misusing Praxis' confidential information and trade secrets, Goldstein and

Actio have been able to accelerate Actio's development of competing KCNT1 inhibitor products, jeopardizing Praxis' and UCB's ability to become the first to market a KCNT1 inhibitor.

83. Even if Praxis retains its first-mover advantage, it will have to compete with any Actio compounds that have been developed as a result of the misuse of Praxis' confidential information by Goldstein and Actio. Competition from Actio's compounds will cause harm to Praxis, including in the form of lost profits and price erosion. These are significant economic harms given the small population of potential patients suffering from KCNT1-related disorders.

84. By misappropriating Praxis' confidential information and trade secrets, Goldstein and Actio have deprived Praxis of the full reputational benefit of its years of research and development. Indeed, Actio's website touts that "Actio is developing an oral, *first-in-class* small molecule inhibitor, ABS-1230, for the treatment of KCNT1-related epilepsy" (emphasis added). Thus, Actio, though its misappropriation, seeks to usurp Praxis' rightful status as the true innovator of novel treatments for KCNT1-related epilepsy.

85. Defendants' unauthorized disclosure of Praxis' confidential compounds in Actio's patent applications has destroyed the value of Praxis' confidential information and trade secrets. These unauthorized disclosures have made Praxis' confidential information and trade secrets available to other competitors, including Actio, giving them a head start in developing competing products without incurring the research and development costs borne by Praxis.

86. Defendants' misuse and unauthorized disclosure of Praxis' confidential information and trade secrets may also jeopardize Praxis' receipt of development milestone and royalty payments under its agreement with UCB, and may allow competitors to attempt to design around Praxis' intellectual property, further undermining the value of Praxis' KCNT1 program.

# CLAIMS

## COUNT I
## TRADE SECRET MISAPPROPRIATION
## UNDER THE U.S. DEFEND TRADE SECRETS ACT
## (AGAINST ALL DEFENDANTS)

87. Praxis repeats and incorporates by reference the allegations contained in paragraphs 1–86 as if fully set forth herein.

88. Praxis' confidential information related to compounds used in the development of KCNT1 inhibitors, including the structure and therapeutic characteristics of particular compounds, qualifies as trade secrets under the U.S. Defend Trade Secrets Act.

89. Praxis' trade secrets are related to therapeutics for KCNT1-related epilepsies, which will be marketed and sold in interstate commerce in the United States.

90. Praxis' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use because it was the result of years of confidential development work using Praxis' screening method.

91. Praxis has taken reasonable efforts to maintain the secrecy of its trade secrets by, among other things, binding all recipients of trade secrets—internal and external to Praxis—to confidentiality agreements, thoroughly classifying sensitive data, training its employees on confidentiality, specifying how to handle secret information through a Code of Conduct, and implementing strict IT security precautions.

92. Defendant Goldstein acquired Praxis' trade secrets under circumstances giving rise to a duty to maintain their secrecy because this information was disclosed to him under the FSABA and MAA, both of which imposed such a duty on Goldstein. Defendant Goldstein knew he was under such a duty because Goldstein executed the FSABA and MAA and obtained

Praxis' trade secrets under the FSABA and MAA. Defendant Actio was aware of Goldstein's duty at least because Goldstein co-founded Actio and has served as its CEO since its founding.

93. Defendant Goldstein misappropriated Praxis' trade secrets by disclosing and misusing them in breach of the MAA, including, among other things, by disclosing them to Actio and using them in the development of Actio's compounds. Defendant Actio misappropriated Praxis' trade secrets by knowingly using and benefiting from them with knowledge that Goldstein acquired them under circumstances giving rise to a duty to maintain their secrecy.

94. Defendants misappropriated Praxis' trade secrets by trying to claim patent rights over compounds developed by Praxis and by publishing them in the Actio patent applications.

95. Defendants' misappropriation of Praxis' trade secrets was willful and malicious. Defendant Goldstein, while still working with Praxis under the MAA, founded Defendant Actio, a rival company. Goldstein disclosed Praxis' trade secrets to Actio, and he and Actio used Praxis' trade secrets in violation of Goldstein's contractual obligations. In so doing, Defendants consciously disregarded Praxis' rights and intentionally caused injury to Praxis.

96. Defendants have harmed Praxis by destroying the value of Praxis' trade secrets and by facilitating the development of products that will compete with Praxis and its licensee. Further, Goldstein and Actio's premature disclosure of Praxis' trade secrets in Actio's patent applications has harmed Praxis by wrongfully claiming intellectual property rights over Praxis' trade secrets. The unauthorized disclosure has also given Praxis' competitors a head start in developing competing products without incurring the research and development costs borne by Praxis and has allowed them to attempt to design around Praxis' intellectual property.

97. Praxis has suffered, and continues to suffer, damages as a direct and proximate result of Defendants' misappropriation.

98. Accordingly, Praxis should be awarded damages and other appropriate relief.

**COUNT II**
**TRADE SECRET MISAPPROPRIATION UNDER THE DELAWARE UNIFORM**
**TRADE SECRETS ACT**
**(AGAINST ALL DEFENDANTS)**

99. Praxis repeats and incorporates by reference the allegations contained in paragraphs 1–8685 as if fully set forth herein.

100. Praxis' confidential information relating to compounds used in the development of KCNT1 inhibitors, including the structure and therapeutic characteristics of particular compounds, qualifies as trade secrets under the Delaware Uniform Trade Secrets Act.

101. Praxis' confidential information constitutes trade secrets because it derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

102. Praxis' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use because it was the result of years of confidential development work using Praxis' screening method.

103. Praxis has taken reasonable efforts to maintain the secrecy of its trade secrets by, among other things, binding all recipients of trade secrets—internal and external to Praxis—to confidentiality agreements, thoroughly classifying sensitive data, training its employees on confidentiality, specifying how to handle secret information through a Code of Conduct, and implementing strict IT security precautions.

104.    Defendant Goldstein acquired Praxis' trade secrets under circumstances giving rise to a duty to maintain their secrecy because this information was disclosed to him under the FSABA and MAA, both of which imposed such a duty on Goldstein.  Defendant Goldstein knew he was under such a duty because Goldstein executed the FSABA and MAA and obtained Praxis' trade secrets under the FSABA and MAA.  Defendant Actio was aware of Goldstein's duty at least because Goldstein co-founded Actio and has served as its CEO since its founding.

105.    Defendant Goldstein misappropriated Praxis' trade secrets by disclosing and misusing them in breach of the MAA, including, among other things, by disclosing them to Actio and using them in the development of Actio's compounds.  Defendant Actio misappropriated Praxis' trade secrets by knowingly using and benefiting from them with knowledge that Goldstein acquired them under circumstances giving rise to a duty to maintain their secrecy.

106.    Defendants misappropriated Praxis' trade secrets by trying to claim patent rights over compounds developed by Praxis and by publishing them in the Actio patent applications.

107.    Defendants' misappropriation of Praxis' trade secrets was willful and malicious. Defendant Goldstein, while still working with Praxis under the MAA, founded Defendant Actio, a rival company.  Goldstein disclosed Praxis' trade secrets to Actio, and he and Actio used Praxis' trade secrets in violation of Goldstein's contractual obligations.  In so doing, Defendants consciously disregarded Praxis' rights and intentionally caused injury to Praxis.

108.    Defendants have harmed Praxis by destroying the value of Praxis' trade secrets and by facilitating the development of products that will compete with Praxis and its licensee. Further, Goldstein and Actio's premature disclosure of Praxis' trade secrets in Actio's patent applications has harmed Praxis by wrongfully claiming intellectual property rights over Praxis' trade secrets.  The unauthorized disclosure has also given Praxis' competitors a head start in

developing competing products without incurring the research and development costs borne by Praxis and has allowed them to attempt to design around Praxis' intellectual property.

109.    Praxis has suffered, and continues to suffer, damages as a direct and proximate result of Defendants' misappropriation.

110.    Accordingly, Praxis should be awarded damages and other appropriate relief.

**COUNT III**
**BREACH OF CONTRACT FOR VIOLATION OF SECTION 6 OF THE MAA**
**(AGAINST GOLDSTEIN)**

111.    Praxis repeats and incorporates by reference the allegations contained in paragraphs 1–8685 as if fully set forth herein.

112.    The MAA is governed by Delaware law.  (MAA § 11(g).)  Under Delaware law, the MAA is a valid contract that is binding upon Praxis and Goldstein.

113.    Praxis has performed its obligations under the MAA.

114.    Section 6 of the MAA prohibits Goldstein from the unauthorized disclosure of any confidential information he received from Praxis.  Section 6 also prohibits Goldstein from using Praxis' confidential information for any purpose other than in connection with the services for which Praxis retained Goldstein to provide under the MAA.

115.    Goldstein breached these obligations at least by disclosing Praxis' confidential information to Actio, including the structure of Praxis' KCNT1 inhibitors, as detailed above, and by using Praxis' confidential information to assist Actio to develop KCNT1 inhibitors.

116.    Goldstein's breaches have harmed Praxis by destroying the value of Praxis' confidential information and by facilitating the development of products, including products by Actio, that will compete with Praxis and its licensee.  By disclosing to Actio confidential information that Praxis spent significant time and money developing, Goldstein has enabled Actio—a company Goldstein founded—to speed up the development of competing products and

do so at a lower cost.  Other competitors, who now have access to this information through Actio's patent applications, will enjoy the same benefits of Defendants' disclosure.

117.  Praxis has suffered, and continues to suffer, damages as a direct and proximate result of Goldstein's breaches of the MAA.

118.  Accordingly, Praxis should be awarded damages in an amount to be determined at trial, an injunction against further breaches and other appropriate relief.

**COUNT IV**
**BREACH OF CONTRACT FOR VIOLATION OF SECTION 5 OF THE MAA**
**(AGAINST GOLDSTEIN)**

119.  Praxis repeats and incorporates by reference the allegations contained in paragraphs 1–86 as if fully set forth herein.

120.  The MAA is governed by Delaware law.  (MAA § 11(g).)  Under Delaware law, the MAA is a valid contract that is binding upon Praxis and Goldstein.

121.  Praxis has performed its obligations under the MAA.

122.  Section 5 of the MAA requires that Goldstein assign to Praxis all work product developed by Goldstein pursuant to the MAA.  Under Section 5, Goldstein represented and warranted that he has and will have the right to transfer and assign to Praxis ownership of all work product and will take all actions needed to confirm Praxis' rights.

123.  Goldstein breached these obligations by misappropriating Praxis' confidential information to assist his new company, Actio, in filing patent applications claiming Praxis' intellectual property.  Actio's patent applications cover compounds derived from work product covered by the MAA, notwithstanding Goldstein's agreement that all work product developed by Goldstein pursuant to the MAA is or would be assigned to Praxis.

124.  Goldstein's breaches have harmed Praxis by depriving Praxis of its right to its inventions, which Goldstein is obligated to assign to Praxis under the MAA.

125.     Praxis has suffered, and continues to suffer, damages as a direct and proximate result of Goldstein's breaches of the MAA.

126.     Accordingly, Praxis should be awarded ownership of the any work product developed by Goldstein under the MAA, awarded damages in an amount to be determined at trial, an injunction against further breaches and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Praxis requests that this Court enter the following relief:

1. Enter a judgment that Defendants have misappropriated Praxis' trade secrets and that Goldstein has breached the Master Advisory Agreement;

2. Award damages to Praxis in an amount to be determined at trial;

3. Enjoin Defendants from disclosing or using Praxis' confidential information and trade secrets;

4. Order Defendant Goldstein to assign to Praxis all intellectual property developed using Praxis' confidential information;

5. Award Praxis exemplary damages for Defendants' willful and malicious misappropriation;

6. Award Praxis attorneys' fees and costs incurred in prosecuting this action;

7. Order an accounting of Defendants' profits, gains, advantages, or the value of business opportunities received, to account for any unjust enrichment;

8. Award Praxis pre-judgment and post-judgment interest; and

9. Grant Praxis all such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Praxis hereby demands a jury trial on all claims and issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jeremy A. Tigan
_____
Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5239)
Anthony D. Raucci (#5948)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Plaintiff Praxis Precision
Medicines, Inc.*

OF COUNSEL

Keith R. Hummel
Sharonmoyee Goswami
Jonathan D. Mooney
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000
khummel@cravath.com
sgoswami@cravath.com
jmooney@cravath.com

Original Filing Date:  October 14, 2025
Redacted Filing Date: October 14, 2025